IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Marion Crane, Benjamin Porter, Robert Taylor and Furman Wingate, | ) ) ) | C/A No. 3:02-3352-22 |
| Plaintiffs, | ) ) | |
| v. | ) ) | **ORDER AND OPINION ON** |
| | ) | **MATTERS HEARD APRIL 7, 2005,** |
| International Paper Company, and Canal Wood, LLC, | ) ) | **AND ON MOTIONS FOR** **JUDGMENT ON THE PLEADINGS** |
| | ) | **AND FOR DECERTIFICATION** |
| Defendants. | ) ) | |

This order memorializes and reaffirms the court's preliminary rulings denying Defendant International Paper Company's ("IP's") motion for judgment on the pleadings or, in the alternative, for summary judgment and IP's related motion for decertification of the class. *See* Docket Text Order entered March 23, 2005 (Dkt No. 238). It also addresses a variety of matters covered during a day-long status conference held on April 7, 2005. While the status conference focused on class identification issues, argument was also heard as to: (1) Plaintiffs' motion for modification of the class definition; (2) the propriety of class certification; and (3) scheduling. Each of these matters is addressed, in turn, below.

**PROCEDURAL BACKGROUND**

This action was commenced in October 2002 seeking recovery for an alleged violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.[1] Specifically, Plaintiffs allege that Defendant

---

[1] The initial complaint was filed on October 8, 2002. An amended complaint was filed on October 20, 2002. Both versions of the complaint assert only the single cause of action.

International Paper Company ("IP") and its Quality Suppliers,[2] including but not limited to Defendant Canal Wood, LLC ("Canal Wood"), conspired to set prices paid for pulpwood at an artificially low level. The named Plaintiffs sought, in both the original and amended complaints, to represent their own interests and those of other similarly situated pulpwood sellers.

Discovery commenced no later than February 2003. *See* Dkt No.'s 24 & 26 (motions for protective order and to compel filed in February and March 2003 respectively). Various class-related discovery motions were filed and resolved during the ensuing seven months while the matter was pending before the Honorable Joseph F. Anderson, Jr.

The matter was reassigned to the undersigned on September 16, 2003. Shortly thereafter, Plaintiffs filed their motion for class certification.[3] Briefing on this motion and related motions continued through mid January 2004.[4] A two day evidentiary hearing on the class certification motion was held on February 23-24, 2004. Additional briefing on class certification issues was received during and after this hearing, continuing through mid March 2004. *See* Dkt No.'s 137 & 142-46.

By order entered March 31, 2004, the court granted Plaintiffs' motion for class certification. Dkt No. 148. A forty-four page opinion entered that same date explained the rationale for the

---

[2] "Quality Suppliers" are those entities and individuals who agreed to participate in IP's Quality Supplier Program through which IP obtained pulpwood during the period at issue in this action. This and other terms used herein are defined and placed in context in the opinion entered March 31, 2004. The present order assumes knowledge of the information and definitions contained in the March, 31, 2004 opinion.

[3] Plaintiffs initially sought to file the entire motion for class certification under seal on September 24, 2003. Dkt No. 92. The court rejected the filing as inappropriate. Dkt No. 93. The motion was subsequently filed in the public record on October 3, 2003. Dkt No. 96.

[4] The related motions included: a motion to exclude Plaintiffs' expert witness' testimony; a motion for evidentiary hearing; numerous motions to seal or redact portions of various exhibits; and numerous motions for pro hac vice admission. *See* Dkt No.'s 94-135.

2

certification and addressed Defendants' related motion to exclude the testimony of Plaintiffs' expert. Dkt No. 149. Defendants sought interlocutory appeal of the class certification decision. By order entered May 17, 2004, the Fourth Circuit declined to accept this appeal.

Thereafter, the parties proceeded to identify putative class members for purposes of notification. *E.g.,* Dkt No. 150 (Class Counsel's Plan for Providing Notice), 153, 155-56. Related discovery also proceeded.

On May 25, 2004, the court held a teleconference in which the parties agreed to amend the class definition. *See* Dkt No.160. The modified definition was set forth in an order entered May 26, 2004 and remained the effective definition until the filing of this order.

After significant further discovery, resolution of various discovery disputes and briefing as to the class identification and notice issues, the matter came before the court for a hearing on November 30, 2004. During that hearing, the court ruled on numerous discovery disputes relating to identification of class members. In the process of addressing those disputes, Defendant IP's new counsel[5] raised arguments relating both to the viability of the action and the propriety of class certification. Rather than hearing these matters at that time, the court set a deadline for briefing of these issues. The court also set a status conference for April 7, 2005 as to the class identification and notice issues.

Defendant IP filed its motions to decertify the class and to dismiss, or in the alternative for summary judgment on January 10, 2005. Dkt No.'s 224-227. The motions were, thereafter, fully briefed. *See* Dkt No.'s 230-31 & 233-37. After fully considering the written submissions and determining that oral argument would not aid the court in resolving the motions, the court entered

---

[5] Defendant IP obtained new counsel in August 2004. *See* Dkt No. 171-179.

a preliminary order denying IP's motions on March 23, 2005.  Dkt No. 238.  The court entered the

preliminary order at that time to focus the April 7, 2005 status conference and related preparation

on class identification and notice issues.  Defendant IP filed a petition with the Fourth Circuit Court

of Appeals for review of the denial of its motion for decertification on or about April 5, 2004.[6]

Although a preliminary ruling had already been issued, the court heard some argument on

class certification-related issues during the April 7, 2005 status conference.  The court also heard

argument on and considered the impact of class identification and notice issues on class

manageability and, therefore, on the propriety of class certification.

Although it initially appeared that the class could involve 7,000 or more transactions, it is

now apparent that fewer than 3,000 transactions will be at issue.[7]  Prior to the most recent hearing,

the parties had agreed that roughly half of this number belonged in the class.  Defendants challenged

notice as to certain of the remaining tracts because they fell into one or more of the following six

---

[6] During the April 7, 2005 status conference, IP indicated that it did not intend to seek a stay pending this interlocutory appeal.  As noted at the conclusion of this order, this court would, nonetheless, delay notice to the class should the appeal be accepted.

IP also indicated that it might ask this court to certify its decision on the dispositive motions for interlocutory review pursuant to 28 U.S.C. § 1292.  While the rulings at issue satisfy the requirement that they involve "controlling question[s] of law," this court does not believe that they satisfy the requirement that there be "substantial ground[s] for difference of opinion" as to the outcome. 28 U.S.C. § 1292(b).  Thus, this court does not believe such certification would be proper. The Fourth Circuit is, in any case, free to resolve the broader issues should it accept the interlocutory appeal of this court's denial of the motion for decertification, particularly given the overlapping legal arguments between the motion to dismiss and decertification motion.

[7] The larger figure comes from a May 2003 interrogatory response in which IP identified 7,460 "Wood Delivery Orders" based on a mill-by-mill listing of "baseloaded tracts purchased by [IP] during the time for which [IP] quoted pricing by stumpage rather than by total delivered price." Plaintiff Ex. M (IP's Answers to Plaintiffs' Fourth Set of Interrogatories (served May 23, 2003)). At the time, IP indicated that this number was likely greater than the total number of tracts at issue because "each Wood Delivery Order can state multiple destinations."  *Id.*  While the final number remains in dispute, the total number of tracts at issue is now well under 3,000 according the submissions received from the parties prior to the April 7, 2005 status conference.

categories (numbers in dispute according to Plaintiffs' pre-hearing submission shown in brackets): (1) grandfathered pricing (40 transactions); (2) dispute as to whether there was a delivery (30 transactions); (3) price agreed after the close of the relevant period (41 transactions); (4) pulpwood owned or sold by a Quality Supplier (112 transactions); (5) dispute as to whether transaction pre-priced by IP (504 transactions); (6) dispute as to whether pricing given was stumpage or delivered (548 transactions).[8]  The number of tracts in dispute was reduced by further negotiations prior to the status conference as well as by rulings during the status conference.   The parties agreed at the conclusion of the hearing to continue to meet and confer regarding their differences on these tracts. The court set a further hearing on July 13, 2005, to resolve any remaining differences for class notice purposes.

---

[8]  Some of the disputes are primarily factual, relating either to the absence of evidence or the presence of conflicting evidence as to a specific point.  In a number of cases, ongoing discovery and discussion may resolve these disputes.   For instance, Plaintiffs indicated that they were still reviewing documents and deposition testimony as to the tracts challenged as having a delivered price.  Counsel estimated that Plaintiffs were likely to concede that roughly 40% of these tracts should be excluded.

Further, a number of tracts are challenged on multiple grounds.  This will ultimately reduce the number of claims requiring judicial resolution as to who should receive notice (and, likely, a corresponding reduction in the number of claims raising individual issues for resolution by jury trial).  Indeed, Plaintiffs' counsel indicated that such a "filtering" was likely to leave roughly 200 tracts challenged on pre-pricing grounds.  To the extent disputes remain, they are likely to be subject to group resolution.  For example, the "not pre-priced" challenges fall into a handful of categories which may well be subject to group resolution.  *See generally* Plaintiffs' prehearing submission at 26-30.

Moreover, as indicated in the hearing, notice will be sent if there is a good faith prediction of evidence favoring inclusion in the class.  In this regard, Plaintiffs may not rely solely on IP's initial listing of Wood Delivery Orders (*supra* n. 7) but must have some additional evidence or good faith prediction of admissible evidence suggesting the putative class member falls within the class definition.  Putative class members so noticed may have additional evidence which will resolve any dispute as to their inclusion (*e.g.,* when an agreement was reached, whether the transaction was completed, whether a sale was brokered and by whom).

Having received and considered the various memoranda and other submissions, as well as oral argument on April 7, 2005, the court reaffirms its earlier determinations and issues the additional rulings set forth herein.

**DISCUSSION**

## I.     CLASS DEFINITION

On April 1, 2005, Plaintiffs filed a motion to modify the class definition.[9]  The proposed modifications fall into two categories.  First, Plaintiffs seek to amend the class definition to specify a broader group of individuals and entities which are excluded from the class.  This amendment would exclude all Quality Suppliers (not just Defendant Canal Wood) as well as "principals, employees, parents, subsidiaries, and affiliates" of either Defendant or any Quality Supplier.

At the April 7, 2005 status conference, Defendants agreed to this amendment but argued that it did not go far enough. That is, Defendants argued that friends and family members of principals and employees of Quality Suppliers should also be excluded.  To the extent this argument may be considered an independent motion, it is denied for reasons given during the status conference as well as for the reasons set forth below relating to denial of the motion to decertify the class.  *See infra* § 3.C. ("Conflict based arguments").

Plaintiffs also seek to extend the cut-off date for covered transactions in three respects.  First, Plaintiffs seek to change the end date for the covered period from June 24, 2002 to June 27, 2002. Defendants agreed to this modification.  Second, Plaintiffs seek to reword the definition by moving the placement of the "baseloaded" requirement to clarify that the pulpwood need not actually be

---

[9]  While the motion was not filed until April 1, 2005, it reflects modifications which had been discussed in earlier memoranda, or discussions between counsel, or both.  In any case, all parties agreed that the motion should be resolved during the April 7, 2005 status conference.

delivered and counted as baseloaded during the period to be covered in the class. Rather, the critical question is whether an agreement for sale was reached between the pulpwood seller and a Quality Supplier during the relevant period. Defendants also agreed to this amendment with certain clarifications which were acceptable to Plaintiffs.

Through their final proposed amendment, Plaintiffs seek to expand the definition to include transactions for which a Quality Supplier obtained a pulpwood stumpage price from IP during the period set forth above and entered an agreement to purchase the pulpwood at (or below) that price sometime after the close of the period. Defendants challenged this amendment on various grounds. The court agreed with Defendants, and denied Plaintiffs' proposed amendment.

In sum, the court accepted Plaintiffs' proposed amendments to the class definition to the extent agreed by Defendants and denied the proposed amendments to the extent opposed by Defendants. The court ruled against Defendants only to the extent their argument that "friends and family" should also be excluded may be considered an independent motion.

The parties were directed to confer and submit specific language incorporating the court's ruling and their agreements. They were, however, unable to reach agreement and submitted alternative proposed definitions on April 14 and 15, 2005.[10] The court adopts the proposed amended language set out below as consistent with the court's rulings:

> (1) All persons, firms, corporations, and other entities (excluding Defendants and Quality Suppliers for International Paper ("IP"), and their respective principals, employees, parents, subsidiaries, and affiliates) who sold pulpwood, or the rights to harvest pulpwood, to or through IP's Quality Suppliers; (2) where such pulpwood was pre-priced by IP and a Quality Supplier and a price was agreed to between the

---

[10] To insure a complete record, counsel should, within two days of receipt of this order, file a copy of the letters and attachments on this issue sent to chambers by facsimile on or after April 14, 2005.

timber seller and Quality Supplier between September 1, 2000 and June 27, 2002; (3) the tract was "baseloaded" under the Quality Supplier Program; (4) in the states where IP implemented the alleged price-fixing conspiracy, including South Carolina, North Carolina, and portions of Georgia and Virginia.

This definition excludes the phrase "based upon that pulpwood price" which Defendants include in their proposed definition.[11]  Defendants argue that the phrase must be included because Plaintiffs must establish a causal link between the alleged conspiracy and any injury.

Defendants correctly note that the court used language during the April 7, 2004 status conference which may suggest an intent to include such a "based on" requirement in the class definition.  On reflection, however, and with the benefit of counsel's letters, the court concludes that the record does not, at least at present, support such a change to the class definition.  The court finds that the addition of Defendants' proposed language would add significant ambiguity rather than clarifying the definition.  The court is particularly concerned that the proposed language may be read to require proof of liability (or at least impact) in order to establish class membership.

This is not to say that Plaintiffs will not be required to prove impact.  Rather, it is simply a recognition that proof of impact is a liability issue not properly included in the class definition.[12]  As

_____

[11]  It is significant that no motion was filed seeking such an amendment.  Consequently, neither the court nor parties had adequate time in advance of the hearing to consider the potential impact of adding "based on" language to the definition.

[12]  A central component of the challenged program was the requirement that a Quality Supplier obtain stumpage pricing from IP before making an offer to purchase a particular tract of pulpwood.  If the Quality Supplier was able to obtain the pulpwood for a lower price, the program called for the Quality Supplier to split the savings (share the added profit) with IP.  Thus, if there is evidence of pre-pricing and if the price ultimately paid was at or below that price, a finding that the price paid was "based on" the price authorized by IP is relatively straightforward.

It does not follow, however, that there was no impact if the price paid was higher than that authorized by IP.  This is because a Quality Supplier may have paid less than it otherwise would have for the pulpwood due to the overall impact of the alleged conspiracy on the market including the agreement among Quality Suppliers not to compete as to price.  Proof of such impact requires resolution of disputed facts and is not, therefore, proper for resolution at the notice stage.

8

noted in the Manual for Complex Litigation:

> The [class] definition must be precise, objective, and presently ascertainable. For example, the class may consist of those persons . . . that purchased specified products or securities from the defendants during the specified period . . . . .
>
> Although the identity of individual class members need not be ascertained before class certification, the membership of the class must be ascertainable. . . . An identifiable class exists if its members can be ascertained by reference to objective criteria. The order defining the class should avoid subjective standards (*e.g.,* a plaintiff's state of mind) or terms that depend on resolution of the merits (*e.g.,* persons who were discriminated against).

*Manual for Complex Litigation, Fourth*, § 21.222 (FJC 2004).

The class definition set forth above requires that the tract be pre-priced. Thus, tracts as to which the only evidence is that a delivered price was quoted are excluded. This leaves some disputes as to what constitutes pre-pricing (*i.e.,* whether giving price caps or ranges constitute "pre-pricing"). Such disputes will, however, be resolved by the court at the next hearing prior to any notice being provided to putative class members.

For these reasons, the court rejects the proposed additional language requested by Defendants. This ruling is, however, without prejudice to any proper motion to amend the class definition.

## II.     MOTION FOR JUDGMENT ON THE PLEADING OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

Defendant IP's motion for judgment on the pleadings or, in the alternative, for summary judgment is based predominantly on IP's argument that Plaintiffs' claims are barred by the "direct purchaser" doctrine announced in *Illinois Brick Co. v. Illinois,* 431 U.S. 720 (1977). This doctrine derives from the case of *Hanover Shoe, Inc. v. United Shoe Mach. Corp.,* 392 U.S. 481 (1968), a Sherman Act case brought by a shoe manufacturer against a manufacturer of shoe-making

equipment. The defendant equipment manufacturer in *Hanover Shoe* argued that the plaintiff shoe manufacturer had not been injured because the shoe manufacturer had passed any excess costs along to its own customers, shoe wholesalers. Rejecting this defense, the "Supreme Court held that an antitrust defendant would not be permitted to defend against a damages suit on the ground that the plaintiff had shifted the cost of the defendant's wrongdoing to the plaintiff's customers." *Dickson v. Microsoft Corp.,* 309 F.3d 193, 214 (4th Cir. 2002) (discussing *Hanover Shoe*).

In *Illinois Brick*, the Court extended the *Hanover Shoe* rule to prohibit damages claims by indirect purchasers. As explained recently by the Fourth Circuit:

> In *Illinois Brick,* plaintiffs, who were indirect purchasers of concrete blocks, sought to recover damages on the theory that masonry contractors, who incorporated concrete blocks purchased from defendants into walls and other masonry structures, passed on the alleged overcharge for the blocks to general contractors, who incorporated the masonry structures into entire buildings, and that the general contractors in turn passed on the overcharge to plaintiffs in the bids submitted for those buildings. . . . The Court extended the *Hanover Shoe* rule and held that only direct purchasers from an antitrust violator can sue for damages, providing two rationales for the rule: it avoids the danger of multiple, "overlapping recoveries" against the original seller by direct and indirect purchasers, and it avoids the "evidentiary complexities and uncertainties" in determining the amount of any overcharge passed through the intermediary to the indirect purchaser.

*Dickson*, 309 F.3d at 214 (internal citations omitted).

The *Illinois Brick* Court suggested two possible exceptions to the indirect purchaser rule: (1) where the indirect purchaser acquired goods through a preexisting cost-plus contract; and (2) where the direct purchaser was owned or controlled by its customer. *Illinois Brick,* 431 U.S. at 736 & n. 16., In the subsequent case of *Kansas v. Utilicorp United, Inc.,* however, the Court cautioned lower courts against creating new exceptions: "The rationales underlying *Hanover Shoe* and *Illinois Brick* will not apply with equal force in all cases. We nonetheless believe ample justification exists for our stated decision not to carve out exceptions to the direct purchaser rule." 497 U.S. 199, 216

10

(1990) (internal quotation marks omitted).

The Fourth Circuit recently addressed development of the *Illinois Brick* direct-purchaser doctrine in a case involving alleged twin vertical conspiracies between Microsoft and two entities which sold computers with installed Microsoft software. *See Dickson v. Microsoft*, 309 F.3d at 213-216. Noting that several courts had, despite the *Utilicorp* admonition, "recognized a 'co-conspirator exception' to *Illinois Brick*," plaintiff in *Dickson* argued that these cases stood "for the proposition that *Illinois Brick* is inapplicable when any conspiracy has been alleged." *Id.* at 214-15.[13]

The Fourth Circuit disagreed, instead interpreting these cases as "standing for the more narrow proposition that *Illinois* Brick is inapplicable to a particular type of conspiracy–price-fixing conspiracies." *Id.* Finding that a broader interpretation would be unreasonable, the court explained:

> Far more reasonable is the proposition that, to the extent a court were to recognize a co-conspirator exception . . . such an exception would be grounded on the damages theory underlying the alleged conspiracy. For example, the rationale for concluding that *Illinois Brick* does not apply to a price-fixing conspiracy is that no overcharge has been passed on to the consumer. *When a dealer has illegally conspired with a manufacturer with respect to the price paid by a consumer, then "the consumer is the only party who has paid any overcharge.*"

*Id.* at 215 (emphasis added–internal citations omitted).

The Fourth Circuit did not, however, reach the question of the effect of the *Illinois Brick* direct-purchaser doctrine on a price-fixing conspiracy. This was because no such conspiracy was alleged in the *Dickson* case. The case at bar does present such a situation, albeit in the context of a plaintiff-seller rather than a plaintiff-purchaser. That is, Plaintiffs in this case allege that the very

_____

[13] The cases cited by the Fourth Circuit are discussed below and include: *Paper Systems Inc. v. Nippon Paper Indus. Co., Ltd.,* 281 F.3d 629, 631-32 (7th Cir. 2002); *Lowell v. American Cyanamid Co.,* 177 F.3d 1228 (11th Cir. 1999); *Campos v. Ticketmaster Corp.,* 140 F.3d 1166 (8th Cir. 1998); & *In re Brand Name Prescription Drugs Antitrust Litigation,* 123 F.3d 599 (7th Cir. 1997).

11

object of the alleged conspiracy was the setting of the prices that Plaintiffs were to be paid for their pulpwood.

This court predicts that the Fourth Circuit would not find *Illinois Brick* to bar Plaintiffs' damages claims under the circumstances here alleged. Other courts have allowed damages claims to proceed under similar circumstances. *See, e.g., Lowell v. American Cyanamid Co.,* 177 F.3d 1228 (11th Cir. 1999) (finding *Illinois Brick* did not bar claim by farmers who purchased products from "middlemen" where such middlemen were alleged to have conspired with manufacturer to set the price of the product purchased). The specific allegations were that the manufacturer maintained two similar rebate programs which paid the middleman-dealer a rebate "but only if the dealer sold the product at or above [the manufacturer's] suggested resale price." *Id.* at 1228. Thus, "the programs allegedly established a minimum resale price." *Id.* Under these circumstances, the Eleventh Circuit Court of Appeals held that "*Illinois Brick* has no application" because plaintiffs were direct rather than indirect purchasers. *Id.* at 1229.

The numerous cases which apply *Illinois Brick* to bar claims are distinguishable in that the plaintiffs' alleged injuries are derivative in some way from a more immediate target of the alleged prohibited conduct. *See, e.g., Campos v. Ticketmaster Corp.,* 140 F.3d 1166 (8th Cir. 1998). In *Campos,* the alleged anticompetitive activity was that "Ticketmaster's exclusive contracts with almost every promoter of concerts in the United States require[d] venues wishing to host concerts to use Ticketmaster for ticket distribution." *Id.* at 1171. Thus, the court concluded that "plaintiffs' inability to obtain ticket delivery services in a competitive market is simply the consequence of the antecedent inability of venues to do so." *Id.* (finding damages claims by ticket buyers who were forced to pay Ticketmaster fees were barred by *Illinois Brick* because the ticket buyers were not

12

direct purchasers).

Notably, the *Campos* court framed the critical question as "whether the plaintiffs are direct or indirect purchasers of Ticketmaster's services." *Id.* The court "defined an indirect purchaser as one who is not the immediate buyer from the alleged antitrust violator . . . or one who does not purchase the monopolized product directly from the antitrust defendant." *Id.* at 1169 (internal citations and brackets omitted). In the present case, Plaintiffs allege that they were the sole and direct target of a combination between IP and its Quality Suppliers to drive down the price Plaintiffs were paid for their timber. Thus, the transaction at issue is the direct transaction between Plaintiffs and the Quality Suppliers, which transaction is the subject of the alleged price-fixing agreement between and among IP and the various Quality Suppliers.

The court also rejects IP's alternative argument that all Quality Suppliers must be joined if the case is allowed to proceed. To the extent the case law suggests such a requirement, it is to eliminate the risk of duplicative recoveries where the "middleman" is both an alleged co-conspirator and a potential victim. *See generally Link v. Mercedes-Benz of N. America,* 788 F.2d 918 (3d Cir. 1986).[14] Other courts have, however, recognized that "what is sometimes referred to as a co-conspirator 'exception' to *Illinois Brick*" is better treated as an allocation of the right to collect 100% of the damages "to the first non-conspirator in the distribution chain," with that right subject to being

---

[14] In *Link*, the Third Circuit suggested that joining the middlemen might be a means of avoiding an *Illinois Brick* problem. *Link* is, however, distinguishable in that only a vertical price-fixing conspiracy was alleged. *See id.* at 931 (listing three prior Third Circuit cases which had applied *Illinois Brick* to vertical conspiracies). Moreover, the "middlemen" at issue had only a limited involvement in the alleged conspiracy. *Id.* at 932 (quoting district courts finding that "the evidence . . . of dealer participation in the alleged conspiracy [fell] substantially short of the level of participation that might trigger [an] *in pari delicto* defense"). Under these circumstances, the court "decline[d] to recognize [an] exception [to the *Illinois Brick* rule] where . . . the alleged co-conspirators are not also joined as co-defendants." *Id.* at 931.

asserted against all or any one of the co-conspirators. *Paper Systems Inc. v. Nippon Paper Indus. Co., Ltd.,* 281 F.3d 629, 631-32 (7th Cir. 2002). *See also Lowell,* 177 F.3d at 1228 (vacating district court's dismissal which was premised on plaintiffs' "failure to join middlemen dealers as defendants").

The circumstances at issue in *Paper Systems* are particularly instructive as both direct and indirect claims were at issue. Specifically, the plaintiffs alleged a conspiracy by five manufacturers of thermal facsimile paper to reduce output and, thereby, raise prices. The trial court dismissed plaintiffs' claims based on the *Illinois Brick* direct-purchaser rule. Plaintiffs appealed this ruling after all defendants other than Nippon Paper settled. *Id.* at 631. Thus, the questions on appeal related to which, if any, claims plaintiffs could assert against Nippon Paper.

The court found that plaintiffs' claims based on paper manufactured by Nippon Paper were barred because plaintiffs had purchased the paper from middlemen who were not part of the conspiracy. *Id.* at 632. Thus, these middlemen, not plaintiffs, had the right to the claim under *Illinois Brick*. On the other hand, as to two other defendant-manufacturers which sold exclusively to "trading firms [which were alleged to be] members of the conspiracy," the court held that plaintiffs were entitled to pursue their claims because they were "the first purchasers from *outside* the conspiracy" and, therefore, entitled to bring suit. *Id.* at 631 (emphasis in original).[15] In explaining the different treatment of the claims, the court stated that, rather than treating this an exception to *Illinois Brick*, "it would be better to recognize that *Hanover Shoe* and *Illinois Brick* allocate to the first non-conspirator in the distribution chain the right to collect 100% of the

---

[15] Two additional manufacturers had sold directly to plaintiffs. Claims against these manufacturers were also not subject to the indirect purchaser rule.

damages." *Id.* at 632.[16]

Also notable is the court's holding that, although they had no direct claim against Nippon Paper, plaintiffs could seek recovery from Nippon Paper for sales made by its co-conspirators. Specifically, the court held that: "If Nippon Paper was among [the] conspirators, then it is responsible for the *entire* overcharge of *all five manufacturers*– and any direct purchaser from any conspirator can collect its own portion of the damages . . . from any conspirator." *Id.* at 632 (emphasis in original).

In the present case, all Quality Suppliers and IP are alleged to be members of a single price-fixing conspiracy. Thus, applying the *Paper Systems* rationale, class members would be entitled to bring their action against IP or one or more of the Quality Suppliers who were members of the conspiracy. They need not, therefore, join the Quality Supplier to which they sold their pulpwood.

For the reasons set forth above, this court denies Defendant IP's motion for judgment on the pleadings or, in the alternative, for summary judgment.[17]

———————————————

[16] While noting the possibility that "if a conspirator defects and sues its former comrade, that snitch would come to own the right to damages," the court found this possibility did not bar claims where no such defection had occurred. *Id.* at 632 (concluding that purchasers from co-conspirator middlemen "are entitled to collect damages from both the manufacturers and their intermediaries if conspiracy and overcharges can be established").

[17] In their memoranda in response to both motions, Plaintiffs rely on a number of documents as to which the court allowed delayed filing. This delay was authorized to facilitate compliance with Local Civil Rule 5.03's requirement that counsel confer before filing a motion to seal to determine if less restrictive protections will suffice. After consultation, agreement was reached to allow filing of all but one of these documents in the public record. As to the last document, the court granted a motion to seal. Thus, all documents are now in the record.

The initial ruling denying the present motions was issued prior to the filing of these documents. The court concluded that review of the referenced exhibits was not necessary to the preliminary ruling as the propositions for which the documents were cited were either not challenged or would make no difference to the outcome of these motions. The court has now examined the documents and reaffirms its initial ruling.

**III**.    **Motion to Decertify Class.**

For purposes of resolving this motion, the court has assumed without deciding that the standard of review applicable to a motion for decertification is as advanced by IP, that is, that Plaintiffs bear the burden of establishing the continued propriety of class certification.   After reviewing the parties' briefs and supporting documents pursuant to this standard, the court ruled, preliminarily, that the motion should be denied.  *See* Docket Text Order entered March 23, 2005. Having now heard additional related arguments regarding class inclusion, the court reaffirms its initial ruling for the reasons set forth below.

**A.    Arguments addressed in initial order certifying class.**

Many of the arguments raised in the motion for decertification were addressed in the Opinion entered April 1, 2004, setting forth the basis for class certification.  While the court is now presented with a more extensive factual record, nothing in that record supports a determination that the class should be decertified.   New arguments, and some aspects of previously presented arguments are, however, discussed in more detail below.

**B.    *Illinois Brick* based arguments.**

IP's arguments in favor of decertification rely, in part, on the *Illinois Brick* direct-purchaser doctrine.  The court finds this doctrine not to be applicable to the claims at bar for the reasons discussed in the preceding section of this order.  Thus, the *Illinois Brick* direct-purchaser doctrine is not a basis for decertification.

**C.    Conflict based arguments.**

Both in its written submissions and at the April 7, 2005 status conference, IP argued that there are inherent conflicts within the class which require decertification.  These concerns are resolved, in certain respects, by the agreed modifications to the class definition which now excludes

Quality Suppliers and expands the entities and individuals who are excluded due to their relationship with either Defendant or any Quality Suppliers. To the extent not so resolved, the court finds that the alleged conflicts do not require decertification.

IP argues that a conflict is presented if friends and family members of Quality Suppliers (or friends and family members of principals and employees of Quality Suppliers) are included in the class. The conflict, according to IP, is evidenced by the risk that these individuals may seek confidential documents or information from class counsel in order to share it with their friend or family member who is affiliated with a Defendant or Quality Supplier. Such an assumption is too speculative to warrant decertification.[18]

In the first instance, IP offers no authority for the underlying assumption that an unnamed class member has a right of access to otherwise confidential information. Even assuming such a right existed, there is no reason the court could not impose limits on the release and use of the requested information. Indeed, if IP's argument could defeat class certification, "friends and family members" of defendants would need to be excluded from every class action.[19]

What authority has been referenced relating to the class conflicts does not support

---

[18] Conflicts that are merely hypothetical or speculative will not defeat certification. *Gunnells v. HealthPlan Services, Inc.,* 348 F.3d 417, 430 (4th Cir. 2003) (noting that, to defeat certification, conflicts "must be more than merely speculative or hypothetical," quoting 5 *Moore's Federal Practice* § 23.25[4][b][ii] (2002)); *In re NASDAQ Market-Makers Antitrust Litigation,* 169 F.R.D. 493, 513 (S.D.N.Y. 1996) (stating that, to preclude certification, conflicts must be "apparent, imminent, and on an issue at the very heart of the suit"). Nonetheless, a class may not be certified where actual conflicts are reasonably anticipated. *See Broussard v. Meineke Discount Muffler Shops, Inc.,* 155 F.3d 331, 337-338 (4th Cir. 1998) (finding conflicts of interest between different groups of class members to preclude class certification under Rule 23(a)(4)).

[19] Even assuming family members might be excluded based on some recognized degree of relationship, the court is aware of no standard or method for ranking degrees of friendship. Such a ranking would surely be a novel judicial undertaking.

17

decertification.  Specifically, IP argues that certification is precluded by the Fourth Circuit Court of Appeal's opinion in *Broussard,* 155 F.3d 331.   The first distinction between the present case and *Broussard* relates to class members' right to opt-out which is present in this case but was not available in *Broussard.  Id.* at 338 ("'The problem of actual and potential conflicts is a matter of particular concern in a case such as this one because [the rule under which the class was certified] does not allow class members to opt out.'" quoting *Retired Chicago Police Ass'n v. City of Chicago,* 7 F.3d 584, 598 (7th Cir. 1993)).  More significantly, there were three categories of class members in *Broussard* who, by virtue of their different positions, had different remedial interests.[20]  In the present case, the remedial interests are aligned because all class members would be benefitted by monetary recovery to compensate for the consequences of the allegedly artificially depressed prices paid for their pulpwood.  There is no competing remedy which would benefit any subset of the class at the expense of any other.

### D.    Management concerns and preponderance of common issues.

IP also argues that the class should be decertified due to management concerns.  That is, IP argues that if Defendants are afforded the due process to which they are entitled, this class action will become unmanageable.  This argument turns on the degree to which individual determinations will be necessitated.  It, therefore, implicates the question of whether common issues predominate.

---

[20] As explained by the Fourth Circuit, the class of franchisees certified in *Broussard* could "be grouped into three categories: (1) former franchisees; (2) current franchisees [who signed a new agreement with a release clause]; and (3) current franchisees who did not [sign the new agreement]." *Id.* at 338.  The former franchisees could only benefit from monetary damages paid directly to the class members.  By contrast, current franchisees who signed the agreement with a release clause could only benefit from payment into a fund to cover additional advertising (the subject of the litigation)–at least if the release was held effective to bar damages claims (which it was).  While the current franchisees who did not sign the new agreement with the release clause could benefit from either form of relief, the class representatives (who fell into this category alone) disavowed pursuit of payment into the advertising fund. *See id.* at 338-39 (finding that the class representatives "election of remedies may have benefitted the non-[new agreement] franchisees and former franchisees, but at the expense of the [new agreement] franchisees who made up half of the class.").

**Preponderance of Common Issues.** These concerns were also at issue in *Broussard* where the court found that "[f]ive significant variations in [class member's] 'factual and legal arguments' [made] it clear that th[e] case failed to present common questions of law or fact[.]" *Id.* at 340. The first difference related to the variety of contracts on which the contract claims were based. The second and third differences related to the inclusion of fraud and misrepresentation claims which required individualized proof both as to representations and reliance. *Id.* at 340-41. The court also found individualized issues relating to tolling of the statute of limitations. *Id.* at 341. Finally, the class members' claims for lost profits damages were "inherently individualized and thus not easily amenable to class treatment." *Id.* at 342. In light of these five categories of differences, the *Broussard* court concluded:

> The class . . . certified was thus no more than "a hodgepodge of factually as well as legally different plaintiffs," . . . that should not have been cobbled together for trial: franchisees' contractual rights and obligations differ; [defendant] directed different representations to different franchisees; franchisees relied . . . in a different manner and to a different degree; each franchisee's entitlement to toll the statute of limitations is fact-dependent; and the profits lost . . . also differed according to their individual business circumstances.

*Id.* at 343 (internal citations omitted).

In the present case, there are no individual issues relating to contract terms (other than price), false or misleading representations, or reliance. Neither are there any statute of limitations concerns. While there may be some variations as to proof of impact or damages or both, the proof required will be far simpler than that at issue in *Broussard* where the measure of impact or damages or both was the inherently complex area of lost profits. *See id.* at 343 (noting "calculation of lost profits is too 'dependent upon consideration of the unique circumstances pertinent to each class member.'" quoting *Boley v. Brown,* 10 F.3d 218, 223 (4th Cir. 1993)).

19

Proof of impact and damages in the present case may, to some degree, be subject to common proof of the degree to which the alleged price-fixing conspiracy was effective in lowering the prices paid to class members for their pulpwood.  While the court presumes for present purposes that there will be some necessity for individualized proof that each class member was impacted by the alleged conspiracy and the degree of that impact (the amount of damages), the proof is not nearly so complex as in *Broussard* and does not preclude class certification.  *See infra* "Manageability."

IP also suggests that the proof will be individualized because it is not clear that every person covered by the class definition was affected by the alleged conspiracy.  This argument arguably seeks to distance IP from its May 23, 2003 interrogatory response identifying 7,460 "Wood Delivery Orders" which presumably fell within the class definition.  *See supra* n. 7.  This "distancing," rests, in part, on evidence that various Quality Suppliers and IP foresters told IP they were abiding by IP's pricing directives when, in fact, they were not.  Indeed, the parties have referred to evidence that various Quality Suppliers as well as IP's own foresters presented IP with false (and even forged) documents to substantiate claims that they abided by IP's pricing directives.

The court will assume for present purposes that the evidence that various Quality Suppliers and IP foresters attempted to evade IP's dictates (and the Quality Suppliers' own agreements) may present some individualized questions or, at the least, questions which must be resolved on a IP forester-by-IP forester or Quality Supplier-by-Quality Supplier basis.  The court is not, however, persuaded that such proof would result in individual issues predominating. [21]

---

[21] The very fact that such measures were undertaken may, in fact, be relevant to common issues of whether an agreement was reached.  That is, there would be no need to fabricate documents to support compliance with an agreement that did not exist.  Discussing similar evidence, in *In re Brand Name Prescription Drugs Antitrust Litigation,* 123 F.3d 599 (7th Cir. 1997), the Seventh Circuit Court of Appeals stated:

As the above discussion suggests, there are certain "macro" issues in this case which are critical to every class member's claim.[22]  Some of these may ultimately be resolved by summary judgment.  To the extent not so resolved, a number of the issues may be addressed by common proof at trial.  Other issues may be subject to proof by grouped mini-trial.  To the extent not so resolved, individualized mini-trials of remaining issues may be necessitated, even on a transaction-by-

---

> The wholesalers point to instances in which they did engage in [activities prohibited by the alleged conspiracy].  This evidence does not erase the factual question of whether the wholesalers joined the conspiracy.  It is just evidence to be weighed in the balance by the trier of fact.  There are inherent strains in a cartel.  A member can do better by undercutting the cartel slightly and obtaining enormously increased volume at a slight sacrifice of unit profit than by honoring the cartel price and suffering an erosion of sales because of cheating by less scrupulous members . . . .  That is why cartels tend to collapse of their own weight. And if the plaintiffs argue the wholesalers were tools of the manufacturers–reluctant accomplices, yet not the less liable for that, . . . rather than principals–naturally they would be restive.

123 F.3d at 615 (internal citations omitted–finding similar breach-of-conspiracy evidence not to preclude a finding that wholesalers participated in an alleged manufacturer-initiated  price-fixing conspiracy).  The court, likewise, attached "no significance . . . to the fact that some of the wholesalers sued the manufacturers," noting that this was merely the result of the incentive created by *Illinois-Brick.*  The court noted, instead, that this incentive "sows dishonor among thieves; [yet] they still *be* thieves." (finding similar breach-of-conspiracy evidence not to preclude a finding that wholesalers participated in an alleged manufacturer-initiated price-fixing conspiracy). *Id.* (emphasis in original).  The court did, however, find that *Illinois Brick* precluded claims by downstream pharmacies which, while hurt by the alleged conspiracy, were not direct targets of it. *Id.* at 606 (but noting alternative potential claims for refusal to deal).

[22]  Based on the numbers discussed during the April 7, 2005 status conference, it appears that the maximum number of transactions at issue is well below 3,000.  Thus, the ultimate class size will also be below that number.  As to all of these transactions, the general nature, purpose and overall effect of the Quality Supplier Program will be at issue and subject to common proof.  These are the primary "macro" issues.  In addition, there are issues which may affect groups of class members, such as a specific Quality Supplier's general practices.  These issues may also be resolved by common treatment and are, for present purposes, also considered macro issues.

transaction basis.[23]  Recognizing this, the court concludes that the issues subject to common proof

remain predominant.

**Manageability.**  IP relies both on *Broussard* (discussed above) and on the Fourth Circuit

opinion in *Windham v. American Brands, Inc.,* 565 F.2d 59 (4th Cir. 1977), in arguing that this court

must decertify the class because Defendants' due process rights cannot be adequately protected

without the case becoming unmanageable.   Without a doubt, this case, like all class actions, poses

manageability concerns.  Recognizing the challenges ahead, the court nonetheless concludes that the

case is manageable without impairing Defendants' due process rights including its right to a jury

determination of disputed issues of fact, if necessary on a class member-by-class member basis for

some class members.

As IP notes, *Windham* bears certain similarities to the present action.  Most significantly, the

putative class consisted of tobacco growers who alleged anti-trust violations relating to the purchase

of their tobacco.  At the same time, there are significant differences.  First, there were three separate

anti-trust violations alleged in *Windham,* compared to the single alleged conspiracy here.  *Id.* at 64

("plaintiffs set forth three separate causes of action under the anti-trust laws: . . . a conspiracy. . . to

fix prices and rig bids . . . ; . . . a conspiracy . . . to monopolize the same markets by percentage

purchase agreements and collusive bidding; and . . . a conspiracy 'to fix, control and restrict'

unreasonably 'the amount of flue-cured tobacco which could be sold per day . . .' primarily by an

---

[23]  Transaction-specific proof may, for instance, be required where there is evidence that a Quality Supplier did not abide by IP's alleged price dictates.  Even where such evidence is present, however, evidence of the Quality Supplier Program's overall effect on the market will be relevant to whether any price-fixing conspiracy had an impact on the particular transaction.  In other words, simply because a Quality Supplier paid more than IP authorized for pulpwood, does not mean that the price paid was not depressed by the overall alleged scheme.

inequitable assignment of inspectors"). Second, there were approximately 20,000 potential class members in *Windham*, compared to fewer than 3,000 here. *Id.* at 66.

The most critical consideration in comparing the present case to *Windham*, however, is the posture of the case on appeal. That is, in Windham, the district judge denied class certification based on his view of the manageability of the action. *Id.* at 65 (noting that district judge found that, if certified, "the action would become unmanageable, because of the complexity of proof of injury and damage" ). This distinction is significant because of the "firmly established principle that the issue of manageability of a proposed class action is always a matter of 'justifiable and serious' concern for the trial court and peculiarly within its discretion." *Id.* at 65.

Setting aside the issue of deference to a trial court decision on manageability, there is still guidance to be found in *Windham*. First, it emphasizes that the "gravamen of [an antitrust claim] is not the conspiracy" itself, because "a mere finding of violation does not result in liability." *Id.* at 65-66. Rather, "the crux of the action is injury, individual injury. While a case may present a common question of violation, the issues of injury and damage remain the critical issues in such a case and are always strictly individualized." *Id.* at 66 (internal footnotes omitted). The court further stated:

> Generalized or class-wide proof of damages in a private anti-trust action would . . . contravene the mandate of the Rules Enabling Act that the Rules of Civil Procedure "shall not abridge, enlarge or modify any substantive right." It follows that in determining manageability, the District Court must have in mind these essential elements of a private anti-trust action and the proof that may be required to establish these elements.

*Id.* at 66 (internal footnotes omitted).

Ultimately, the Fourth Circuit concluded that the district court did not abuse its discretion in denying class certification in light of the "multiplicity of claimants," "the complexity of their claims," and the "highly individualized character the proof of injury and damages would assume."

*Id.* The court also noted that these problems were "increased not simply by the necessity of individual proof and calculation but also by the variety of claims." *Id.* at 67 (noting that not all plaintiffs complained of the same combination of violations).

While *Windham* might well support this court's decision should it deny class certification based on management concerns, it does not mandate that result. Indeed, the Fourth Circuit acknowledged in *Windham* that there are a variety of authorities which suggest that it is wrong to deny class certification based simply on "difficulties of establishing injury and damages." *Id.* at 67. At the same time, the court recognized that there were

> equally respectable authorities in which certification of an anti-trust action was denied because of the complexity of, and the difficulties connected with, the proof of individual injury and damages. This conflict . . . seems to reflect more a factual difference in the cases themselves than a difference over legal principles. Thus in cases where the fact of injury and damage breaks down in what may be characterized as 'virtually a mechanical task,' 'capable of mathematical or formula calculation,' the existence of individualized claims for damages seems to offer no barrier to class certification on grounds of manageability. On the other hand, where the issue of damages and impact does not lend itself to such a mechanical calculation, but requires 'separate [mini-trials] of an overwhelming large number of individual claims, courts have found that the 'staggering problems of logistics' thus created 'make the damage aspect of (the) case predominant,' and render the case unmanageable as a class action.

*Id.* at 67-68 (internal footnotes omitted).

For present purposes, the court assumes that proof of injury and damages in this case will be more complex than "virtually a mechanical task." At the same time, assuming some requirement for individualized proof, the court concludes that the size of the class and the complexity of the claims will not force the court to choose between manageability and due process. Thus, the court concludes that manageability concerns do not require decertification.

**Continued monitoring.** The court will, however, continue to monitor the propriety of class certification as this matter proceeds. As appropriate, the court will consider refining the class

definition and the creation of subclasses.[24]   The court remains cognizant of its duty to consider decertification of the class should difficulties arise which cannot be resolved by such narrowing or subclassing.

## IV.  CLASS IDENTIFICATION PROJECT

The court will not repeat here its guidance and directives as to the class notification project. It does, however, appear that the parties have made and continue to make substantial progress in reducing the number of putative class members as to whom there is a dispute as to whether they should receive notice.  The court anticipates that the guidance provided during the status conference should further aid the parties in reducing the number in dispute.

As noted during the status conference, the court will require notice be sent to a putative class member if there is a prediction of evidence from which a jury could conclude that the individual or entity is a member of the class.  With this in mind, the notice should make clear that receipt of a notice does not mean that an individual has a claim.  Similarly, the court encourages the use of tailored notices to different subgroups where differences in circumstances suggest that such tailored notices may aid the individuals in determining whether they have a claim and in deciding whether to opt-out of the class.

## V.      FURTHER PROCEEDINGS

The parties are to continue in their cooperative effort to identify all persons who fall within the definition set forth in Section I above as well as to prepare proposed notices for mailing and publication.  The following schedule shall apply to the further proceedings:

April 29, 2005 –        complete joint conference and submit proposed notices to court for

---

[24]  A number of IP's present concerns may be addressed through such refinement as well as through the ongoing project to identify tracts appropriate for notice.

review (set meet and confer date with chambers staff to finalize);

June 3, 2005  –    conclude meet and confer duties on identification of persons to receive class notice;

June 17, 2005  –    file reports summarizing status of class member identification project (reports shall summarize both disputes and agreements as to persons to receive notice and any subgrouping for specialized notices);

July 13, 2005  –    hearing 9:30 a.m., courtroom 2, to resolve any remaining issues for class notice identification project.

Additional deadlines will be set after the conclusion of the July 13, 2005 hearing.[25]  Subject to later modification, the court anticipates trial will not proceed until January 2006 or later.[26]

**IT IS SO ORDERED**.

s/Cameron McGowan Currie
CAMERON MCGOWAN CURRIE
UNITED STATES DISTRICT JUDGE

April 19, 2005
Columbia, South Carolina

C:\temp\notesB0AA3C\02-3352 vlv crane v IP 4-7-05 hearing (dismiss, sj, decert, notice, schedule).wpd

--------

[25]  The court will defer publication and mailing of notices until any interlocutory appeal is resolved.  The court does not, however, anticipate staying the proceedings prior to that time. Counsel have, likewise, indicated that they do not anticipate seeking a stay pending interlocutory appeal.

[26]  This date is provided primarily for internal scheduling purposes.